2-17-0515, Illinois, Tennessee, Appellee, Nicholas E. Glucksmann, Defendant's Counsel. I'm here with the defendant's counsel, Mr. Leonard C. Williams. I'm here with the defendant's counsel, Mr. Leonard C. Williams. I'm here with the defendant's counsel, Mr. Leonard C. Williams. I'm here with the defendant's counsel, Mr. Leonard C. Williams. I'm here Mr. Glucksmann raises three issues in his briefs. I would like to begin very briefly with the issue of the Fry hearings. I recognize that in some sense this is the most difficult issue because we're asking the court to make new law. However, we believe that this is an appropriate case where this court should make its voice heard on this important issue. This case is unusual in that the state's case rested entirely on the opinion of medical witnesses. There was no corroborating evidence. There were no broken bones. There was no fractures. There was no evidence typically seen in abuse cases. Isn't that evidence that is testified to that is consistently seen in like a shaken infant case? Bilateral hemorrhaging behind the eyes, swelling of the brain, hemorrhaging of the brain. Aren't those consistent, maybe not with all child abuse cases, but certainly with cases of what was alleged here, a shaking or a fall? That certainly is what this verdict was based on, was the opinion testimony that there was retinal hemorrhaging and intracranial hemorrhaging. However, this court and other courts have recognized that the science has changed dramatically over the last two decades. Well, how about the pure opinion exception? I think what the case that was relied on by the trial court, the Cook case, basically tried to make the distinction between whether they're relying on methodology of science, whether they're relying on knowledge and experience, and the judge went back and forth on that. Eventually, he initially said, I'm going to have a prior hearing, and then changed his mind. It seemed like the state sort of wore him down, and he eventually came to the But the problem with that in a case like this is you have, you know, clinical experience doesn't count for much. It's in a case like this where there's no way to evaluate whether the doctor is correct. The doctor may say I'm correct because the defendant got convicted, but they got convicted on the doctor's testimony. Well, but the one doctor who came in and talked about not so much her methodology, but the specialty, it's Dr. No, the one who came in and actually testified, too many doctors and I can't remember her name, but she came in and said, there are a variety of things this could be, and my job is to narrow down based upon observation, based upon testing, based upon, and if these things can all be observed, then someone else should be able to come in and say, well, those observations were not accurate. So there is a way to test her opinions or anyone's opinions by having someone look at the same factors. Except the problem is, what the science has shown, is that accidental causes can produce the exact same symptoms that were seen in this case, and that's where we just don't have, we have a closed loop. So we have doctors that are saying, yeah, I have experience. Basically what convinced the trial judge, if you go back and look, Dr. Dacca testified pre-trial, and she said, well, I have some experience in hospitals, and I've seen babies that fell two feet off of a bed and didn't have these significant injuries. Hundreds, I think she said, didn't she? I don't remember hundreds, but I think the point is, this is not a scientific study that she's relying on. We don't know whether any of those babies had pre-existing conditions or prior chronic bleeds the way this child did. And we don't know whether the babies fell on a hardwood floor the way this one did. How would a fry hearing, how would we get around that in a fry hearing? You make a good point. I mean, we don't know that a baby fell at the same time or was treated the same way. How is a fry hearing going to change these general opinions, medical opinions that are basically generally accepted with respect to shaken infant syndrome? I think what a fry hearing is going to test is whether this is generally accepted science. And I know it's not precedential, but other courts have started to look at this, have granted fry hearings. In fact, there's a case in New Jersey, the Jacoby case, which I can supplement the record with, where they found that this was not generally accepted science anymore. This is dogma from the late 1990s, and new studies show that this is simply not. And basically what they said is, we're excluding this evidence from trial. We will not allow evidence of retinal hemorrhaging and intracranial bleeding as evidence of child. But only if you are calling it A.H.T. or shaken baby syndrome. Not that case, I don't believe, said that you can't have evidence of those things and there can be opinion about it. We just can't call it something. Isn't that correct? The court was pretty, and I will supplement and you can look at it, but the court was pretty clear that they're excluding. How would you ever prove an injury case where these things occur? Well, I know this person's injured, but I can't tell you why because I can't tell you about that. That doesn't make any sense. You asked a very good question. I'm not sure, but I think these are things that are going to be worked out in a fry hearing. The fact is, a fry hearing has never been recognized as the law, that the science has changed. And this seems to be an appropriate case since it's so reliant on the opinion. In fact, the trial judge says, I'm just going to accept the opinions of these medical witnesses. They seem to think this was consistent, that a fall from the bed wouldn't produce these symptoms, and therefore I'm going to find them guilty. Well, you have nine different doctors basically opining the same thing, don't you? You do. And I'll speak more about that when I talk about sufficiency. If I may move on to that. Yeah. If the court doesn't have any more questions about the issue of the fry. Well, let me just ask you one thing about the fry hearing. Don't you think Illinois rule of evidence 702 is kind of dispositive on it? About expert witnesses testifying. And you only need basically, it's a codification in a sense of fry, in the sense that you only need to lay that kind of a foundation where, or you don't need it, where the opinion is based on things that are sufficiently established to have gained general acceptance in a particular field. That's correct. And I think that's what a fry hearing will determine, is whether this is generally accepted. Science, and it certainly was in the late 90s. I think there's a real question on whether it still is today. And so, Your Honor, we believe a remand is necessary for a fry hearing. We don't believe it's necessary because we think this is the rare case where no rational fry or fact could find this evidence sufficient beyond a reasonable doubt. But, you know, and I'm just, I'm sorry. I'm just going to go back real quickly. You have your expert who said, no, no, no, they're fool of it. They're wrong. Dr. Tease, and you have other experts. Post-trial. Yes. Well, Dr. Tease testified at trial. Dr. Tease testified at trial, then post-trial. You had two others. Dr. Tease retestified with two other experts. Right. Including the radiologist, Dr. Mack, and another radiologist. But Dr. Tease referred to Mack and Barnes, was it? Maybe that was the other doctor. She referred to information that they had produced because she reviewed their records, correct? She worked with Dr. Mack in preparing her, because Dr. Tease was not a radiologist. Is not a radiologist. No, she's a pathologist. She's a forensic pathologist. Correct. What I would say on the issue of sufficiency, and this case in many ways stands alone. It's different from every other case cited by the trial court, relied on by the trial court, cited by the state in its brief. No eyewitness testimony. The mom, in fact, was stepped away. She didn't hear any evidence of abuse. No confession, no precipitating event where the child was doing anything other than sleeping until just prior. He had just woken up from a nap at the time he was injured. Didn't mom say something about dad was kind of short or in a bad mood? Didn't mom testify to something? I don't know if she testified that the police officers interviewed her and she said something to that effect. I don't recall that testimony. I'm sorry. Your Honor, the mom had testified that she was downstairs when this happened. She heard the baby crying. Immediately the defendant brought the child down and said, I think he's injured. They rushed him to the emergency room. She was certainly close enough to have heard that there was some commotion and was not. I thought mom had said that the defendant was tired and frustrated before the baby went to sleep. The defendant was easily angered that night or that day or whatever by seemingly little things. That's what I thought. So that actually does corroborate to some degree, right? He was in a bad mood. But there was certainly no evidence that there was any precipitating event. I mean, the testimony was that the child had just woken up from a nap. The father was going to prepare a bottle and tripped on his comforter and pulled the child off the bed onto the floor. I think the other thing that's unique about this case and different from the cases relied on by the court, and the cases relied on by the court are primarily Renteria, Rader, and Ripley. Here, in those cases, the injuries were severe and permanent and, according to the court and to the experts, could only have been caused by abuse. Here, if you look at the testimony of the experts, all they say is that it's a faulty, that the fall from the bed was not consistent, that injuries were not consistent with falling from the bed. Dr. Shupak, it raised a concern for me. Dr. Chinuva, injuries were not consistent with a fall from the bed. Dr. Havilaj, injuries not consistent with a fall from the bed. Dr. Shapiro, they were consistent with shaking baby syndrome. But aren't those all medical opinions, expert opinions based upon experience and a reasonable degree of medical certainty? Well, they didn't use the word they said this is not consistent. In some of the other cases, the doctors will say that this is my opinion based on a reasonable degree of medical certainty that this is abuse. They don't say that. They say it's consistent with, or that the injuries that the child appeared to have don't appear consistent with the history recorded by the father. We're not supposed to define reasonable doubt to a jury, and a judge isn't supposed to define reasonable doubt necessarily in an opinion or in a decision. But if you have experts saying, in my experience, this is not consistent with this, and I have seen this before, the judge is not supposed to consider that? Well, again, I have seen this before. I think that there's a real question about that, because we don't know. Well, then you ask a question. That's defense attorney's job, to ask questions about when, how, where, what happened. We also have three of the experts that said just the mere presence of retinal hemorrhages suggests to them that this is an abuse case. It clearly is no longer generally accepted science. And there was testimony. Well, how does a baby, how do retinal hemorrhages occur in a baby? Well, what the testimony was in this case is that, and this was also addressed in the Johan Kay case, is that the testimony in this case was that intracranial bleeding can cause a raise in pressure, which can produce retinal hemorrhages. But Dr. T said there wasn't any swelling of the brain. Not swelling of the brain, but increased pressure from the intracranial bleeding that's outside the brain. It doesn't necessarily produce a bruise on the brain, but that the pressure can increase and it can cause retinal hemorrhages. In the Johan Kay case, the court said that simply intracranial bleeding into the space, I forget the word that they used, can appear as retinal hemorrhage. So, again, I think, I guess the question is whether you can get, in a case that's based entirely on the opinions of the experts, can you get to beyond reasonable doubt, where all the experts say is it's consistent, or the fall from bed is not consistent with the bodily reports, with what I'm seeing here. The other thing that I would point out that I think is very important in this case is that all of the state's medical witnesses relied, all except one, it relied almost exclusively on Dr. Shupak's report, his radiology report. And that report was from the emergency room on April 16th. It showed multiple areas of intracranial hemorrhage. It raised concerns, because if the bleeding continued, the child was going to face serious danger. They airlifted him properly to a trauma center, where in case it kept bleeding, they could operate and relieve the pressure. Based on this report, the witnesses were concerned. However, there was a second radiology report from the next day. It was actually eight hours later, and it showed that the bleeding had stopped. In fact, it was a transient event, and that there was no serious danger to the child. In fact, the child was ready to be released from the hospital the very next day. Are you going to great bodily harm? No, I'm not. I'm really on sufficiency for all of the charges, but yes, it is great bodily harm because the injuries weren't permanent. You don't need to have permanent injuries in order to have great bodily harm. Do you, counsel? I think that's correct. I'm really not focused right now on the great bodily harm issue, but just on the sufficiency, whether they've proven that this was a non-intentional injury. And I think it's important to look at the one state witness that did focus on the second scan, and that was Dr. Strimley. Actually, when I went back and looked at the record and looked at my brief, I didn't accurately describe his testimony. I apologize for that. On page 17 of our brief, it says that he had only found chronic bleeding on one side of the brain. When I went back and looked at his testimony, in fact, he's very clear. When he looked at that second scan, it shows that the bleeding had stopped. He also said, and this is on page 74 and 75 of his testimony, Doctor, is it fair to say that there was new and old blood on each side, left side and the right side? Answer, yes. That is exactly what I'm saying. And he goes on to say that there's a acute bleed. Could that happen as re-bleeding? Answer, yes, it could happen. So what we have in this case also is evidence of a pre-existing condition. It's undisputed that Elijah, this boy, had a pre-existing condition, a prior intracranial bleed, almost certainly related to his very traumatic birth. He was stuck in the birth canal. They used vacuum suction to pull him out. He spent two weeks in intensive care. Now, the state medical witnesses, and as Justice Spence correctly says, there was, I don't know, nine of them, they were not aware at the time when they were alarmed by what they saw in the Chupac report, they were not aware that this child had a pre-existing condition. In fact, several of the witnesses said it was the combination of chronic, older, and acute, newer bleeding that alarmed them and thought that maybe this is an abusive family. It was only later when the state chose to prosecute the defendant, and their theory was that he injured this child on April 16th, that they literally just brushed aside this evidence of the pre-existing condition, so much so that the child was in good health. If you look at the... But didn't, on cross-examination, they indicate that these birth injuries that were talked about, that being the suction, the removal, as well as the mother's methadone use, they testified that that would not cause the injuries. I think that's correct. I think what the testimony was, yeah, there was significant issues that this baby had, had respiratory issues, but what was believed is that this prior intracranial bleed happened as a result of the vacuum suction birth. There were some questions about there could be some blood disorder, and there was a rule out, and some testing that wasn't done, but you're correct, that some of these other things probably would not be related to the brain bleed, but I don't think there was any dispute in this record that he had a pre-existing condition, a prior intracranial bleed, the doctors saw it on the scan, and that it was almost certainly related to this traumatic birth. Counsel, your time is up. You may summarize here, and you'll have an opportunity to reply. Thank you. I didn't get to the other issue of ineffective assistance, but maybe I'll just save my final comments for rebuttal if I may. Ms. Kripke. Good afternoon. Joan Kripke on behalf of the people of the State of Illinois Council. There are some procedural issues I would like to address before we get to the factual issues. The first procedural issue, which the defendant does not talk about at all, is the fact that he has forfeited for review anything related to pertaining to the Frye hearing, and why do I say that? The defendant had trial counsel who raised the issue of having a Frye hearing. The court first said yes. The state objected. The court changed its mind later on, said that the Frye hearing would only come in if there were witnesses that talked about, as they put, shaken baby syndrome, SVS, or abusive head trauma, AHT. They never did. The court said very specifically, that only comes in, a Frye hearing only comes in if those terms are used, and I think there's only once. I think Dr. Shapiro threw out the term shaken baby, and that was the only time. And I think it was consistent with, or something along those lines. Yes. That trial attorney filed a post-trial motion. She was then dismissed as post-trial, as an attorney, and another attorney, Attorney Brukovich, was hired to be the post-trial counsel. New post-trial counsel did not file a brand new post-trial motion, and then reference the post-trial motion filed by the trial attorney, which did raise the Frye issue. They did not raise it in any of their arguments. In all of the court sessions leading up to the post-trial arguments on the second set of post-trial motions, the Frye issue was never raised. It was never adjudicated. It was never challenged, and therefore it has been forfeited for review. Was it raised in the first trial attorney's post-trial motion? Right. But there's two problems with that. One, the second post-trial attorney did not incorporate that by reference, and in their post-trial motion, they accused the trial attorney of ineffective assistance of counsel. How can they accuse that person of ineffective assistance of counsel, yet adopt their pleading? I mean, that's contradictory. Either the person's ineffective or they're not. But they didn't. They didn't even reference it. They came in and called it post-trial motion and then amended post-trial motion, as if the other one never existed. So I would argue that it has been forfeited for review. And instead of saying in their brief, in their reply brief, instead of responding to our argument that it had been forfeited, they did not even try to, and they did not raise it as plain error. Nor did they ever raise it as plain error. So it has really been forfeited for review. And it is gone, especially because I pointed out that it had not been raised as plain error, and they still didn't raise it as plain error. They had the opportunity in their reply brief to do so, but they didn't. We don't like that, but they do have that opportunity. We don't like that. But now that they didn't do it, I'll be happy to point out, much said by your opponent regarding the unlikelyhood that this father did this to the child, the shortfall, which his expert says is not likely going to cause retinal hemorrhaging, bilateral retinal hemorrhaging, the bruise on the face, or, you know, mom's methadone use and the suction extraction. These are all things that could have caused this. How do we not, how do we ignore that in light of the mental state? I think the court made a very specific finding as to why this person, why the defendant was guilty. First, it addressed the age and familial relationship issue. Nobody's contesting that. Then they found that there were three, the experts at the state put on, and then at Chakratees. And then at what? And then at the testimony of Dr. Chakratees. And the court found Dr. Tease simply to be incredible. He said, she kept throwing out, well, it could be this, it could be that, it could have been, and there was never a finding, an absolute finding that this child had had, there was no proof that the child had had a prior problem due to the birth. That was Dr. Tease's supposition. And when you look, and we pointed out in our brief, there were at least 14 pages during the testimony of Dr. Tease, both pre-trial, I mean during trial and post-trial, in which she used the word, she equivocated about whether, about her findings. And the court simply did not find her to be consistent or credible. And found the people's doctors all to be consistent, more than far over, the people's doctors testified like how doctors practice medicine. And I find it peculiar that the defendant is now arguing that that type of methodology is strange, or it's new, or it's something that should be subject to a primary. It's not. That is the way an expert determines the cause of an illness, or what's wrong, diagnoses a problem with any patient that comes in. And the court found them to be consistent among them, and found them to be, and found them also to be inconsistent, their diagnoses to be inconsistent with what the defendant admitted. The defendant admitted, and the court found this specifically, he admitted during trial and during his testimony post-trial, he admitted to shaking this child. He admitted it several times. And he admitted that he pulled that child off the bed by, you know, some convoluted method of slipping on here while he was rushing there. And they said none of that actually added up. The court said the defendant's testimony was, the people tried to impeach him, didn't find that it was, his testimony was particularly inconsistent. But the court then said he admitted to harming the child gently. Gently. And the court said, I don't find this to be credible based on the injuries sustained by the child and based on the consistent testimony of the state's doctors. And he said there was an admission. It's not like he said, I don't know what happened. The baby slipped onto the floor somehow when I was getting the bottle. Oh, my God. He said almost exactly what was in the Renteria case or the Ripley case, I can't remember which one, where they said the same person, oh, the baby fell a couple of feet and I shook it to revive it. And the court concluded because the defendant was minimizing his actions, both on what he testified, how he testified, and on his statements to the police and to the medical personnel. They felt that he was minimizing his actions. And the court said, look, no one else was near this child when it suffered the injuries that it suffered. The mother was downstairs. No one else was in the room. This is a three-month-old child. Something had to have happened to this child that caused these injuries. And maybe it was the mom's methadone use or maybe it was an injury that the child had at birth. But those things were disputed by Dr. Dackel who said, first of all, if this child was still suffering, had injuries for methadone, due to methadone use of the mom, which there was no testimony that methadone use by the mom would cause the retinal hemorrhaging or the brain bleeds. There was no testimony to that. Dr. Tease indicated that it may. It may. It may. She had a lot of suppositions of what may cause it. But she's also a pathologist. She's not a doctor. She is a doctor. She's not a treating doctor. Thank you very much. So there were many Dr. Tease was trying to prove. Isn't that what the state's experts said? No. Because they say that they don't do that. That their job is to say, is to identify medical problems that have resulted in the child. And then the mother, as Dr. Dackel said, what she does is she takes all the available information, interviewing other parents and all the people who handled the child, records, whatever, and comes to a conclusion. If the mother had come in and testified, I was holding the child and I slipped on the icy steps and we both went down, and you see mom there with bruises or a broken arm and a child that has brain hemorrhages, she may very well conclude that this was an accidental fall on the part of the mother that caused the child injury. But she was saying in this particular case, you don't have that type of information being presented to her. And the conclusion that they bring therefore is that this was not an accidental injury that occurred to this child. And it's not consistent with an accident of the type of a baby rolling off of a bed or of somebody lightly shaking a child to wake it up, you know, from a sleep or from whatever to make it. Everybody has taken a bit and pushed it on the shoulder to say, come on now, wake up. And that doesn't cause retinal hemorrhaging, bilateral retinal hemorrhaging for which that child was continuing to be treated. It wasn't just, oh, yeah, we took him to the hospital and the bleeding stopped. This child was continuing to see medical doctors for that retinal hemorrhaging. And so for all these reasons we believe that the court properly found that there was the correct mental state because the court said, and it was the hardest thing to really pull out of the case, the court had known that doing these acts with a three-month-old child who had not had the knowledge that this would cause great bodily harm to the child, and this child suffered great bodily harm. Thank God that the child was not permanently injured. Was there any evidence that indeed if the child had the had problems from the hospital or more likely to suffer harm like this if an accident occurred? Did anybody testify as to that? I don't recall hearing any kind of testimony like that. Because the only people who really, I mean, the child remained in the hospital for several weeks after the birth due to the methadone and I don't know what else. But there was pre-trial and post-trial about that methadone, about everything that she observed. Well, she obviously knew from her using what she does, she knew about those things from review of the records that she must have gotten somehow. I'm relying on you at this point. I don't remember everything that Dr. Bakel testified to, but she was very thorough. And then I think she did recall reading that she addressed those particular issues, but it's not that she discounted them. She did not believe that they were factors in the injuries, the acute injuries that that child was suffering at that time. Is Dr. Bakel the only one who addressed the methadone and also the delivery as a baby? I believe so. Because the other doctors were all treating doctors at the time, at the hospital, and they probably would not have had access to those records. Ms. Kirkkey, I know counsel is going to get to ineffective assistance when he gets up on the peddle, so I'd like to ask you to speak to it. I mean, you have a lawyer here who failed to call experts to testify regarding as counsel honed in on the growing studies that are going on today about these fallacies with shaken baby syndrome, not necessarily shaken infant syndrome just because you have a bilateral retinal hemorrhaging. I mean, I remember there was a time when they would say if you had a broken femur, that was consistent with the shaken infant syndrome. So they're saying, he is saying an injury that he never really addressed that issue along with other issues. What do you say to, what do you say about the ineffective assistance? First of all, this also has been forfeited because he didn't raise this. You indicated that at the trial court, how could he adopt their post-trial motion when they raised ineffective assistance? I'm talking about the post, he's talking, they did They raised ineffective assistance of counsel below, did they not? Not in their, if you look at the motions that were filed, they did not raise the ineffective assistance of counsel for failing to bring in Dr. Oh, maybe not for failing to bring somebody in, but they raised ineffective assistance down below, correct? But not on this particular issue. They did not raise it on this particular issue. I went back this morning to look at the post-trial motions that were filed because I was confused or what I had written didn't seem to make sense. And I went back and I went through both of the post-trial motions filed by post-trial counsel, not by the original counsel. And there were all kinds of issues having to do with Jean-B. F. Grimes, the mother. There were all kinds of other issues. They may have spoken about them, but they never raised them in their motions per se. What they did say was, and the court discounted it, they said, look, you brought in Dr. Not Grimes, the lady doctor. No, Dr. Matt. She came in, she testified at the post-trial hearing. And I also want to point out that at some point in their brief, they rely on Dr. Matt's testimony for the truth of the matter, for the actual testimony, and they say this proves up whatever they were trying to prove. Her testimony, it was an improper use of her testimony. Her testimony only came in for an ineffective assistance of counsel argument. It was never supposed to be used to show the truth of the matter being asserted in that particular case. And what the court found was, first of all, Dr. Tease consulted with both Dr. Matt and Dr. Grimes and said Did she testify to that fact? Yes, she did. And it was, I mean, that's not a question. She had reports from both of them. She spoke extensively with Dr. Matt over the telephone. Dr. Matt did come in at the post-trial hearing, and she did testify. What the court found was she didn't add anything except perhaps more detail than Dr. Tease had testified. She didn't come in with a different theory. She didn't come in with a different approach. So she was there to show that they should have called her, so he was ineffective for not calling her, correct? But the court didn't find that. The court said she didn't add anything. What they were trying to say is you should never have brought in Dr. Tease to begin with because Dr. Tease is a pathologist and not a treating doctor. So now they bring in a treating doctor, and they said she didn't say anything that Dr. Tease didn't say in terms of any kind of new theories, new medical ideas. All she did was give perhaps more detail. So the court said there was no ineffectiveness by using Dr. Tease. And for all these reasons, we think that these convictions should be affirmed. Thank you. Thank you. All right. Mr. Goodman. I'd like to address some of the points brought up by opposing counsel. First on the issue of whether Frye is forfeited. It was fully litigated below in front of the trial judge. But it needs to be renewed in some sort of a post-trial way. Where was it? It was renewed by the trial attorney in the post-trial motion. But once that's amended or once there's a new motion, that ceases to exist. That is as a matter of law. Did they adopt his post-trial motion? I can't answer that. I mean, post-trial counsel is here. I mean, my understanding is that it was fully litigated below and that post-trial counsel didn't see the reason to relitigate something that had been fully litigated below. She focused on ineffective assistance of counsel. So when you say below, you're saying it was fully waived at the trial. Prior to the trial. There were extensive hearings on the Frye issue. I think just in terms of you're talking about waiver or forfeiture, generally it's did you give the trial judge a chance. I think this record is very clear that the trial judge had a chance. In fact, he went back and forth several times on the Frye issue. But he did make a ruling that we weren't going to have any diagnosis concerning age, T or shaken baby. And it wasn't even to be mentioned, but yet one doctor mentioned it. So there was an issue that came up at trial that I don't even think there was an objection to at that point. I mean, the judge's order is somewhat confusing. He said, I don't want evidence of a diagnosis, but you can give your opinion. And I'm not going to accept your opinion, but I'll rely on your opinion. So I don't know exactly. I mean, maybe it would have been more significant if it was a jury trial and we would have seen how it played out. But I think if you look at the judge's ruling, he clearly just says there's no other evidence that he points to. He says that I accept the opinions of the state's experts, and there was, I don't know, eight or nine of them that all said this appears inconsistent. On the issue of the prior injury, Ms. Kripke says, well, there was no proof of a prior injury. I would bet you different. I think the record is very clear. In fact, the scans show that there was a prior chronic old intracranial bleed, and four separate state witnesses conceded. Dr. Chinwuba on page 436, I agree that it is possible that a short fall can cause re-bleeding from an old bleeding. Dr. Havilah on page 452, if there is an old subdural bleed, it tends to create more fluid around the brain, and another fall, another event can cause a new bleed. Dr. Deckel on page 591, yes, a re-bleeding from an old bleeding can happen with a short-distance fall or impact. Dr. Mack, who testified post-trial, was even more clear. She explained that the prior injury, almost certainly related to traumatic birth, produces fragile vessels on the heels, and those can re-bleed with minor trauma or with no trauma at all. But allegedly that's not why she was called. She was called to show that I should have been there at trial. So to take that evidence into account would have been inappropriate at that point, wouldn't it have been? Well, I suppose as far as sufficiency goes, you're correct. She was brought in on the issue of ineffective assistance of counsel. And I think... I have a question. Just a question. I'm sorry. At the time of trial, at the time of diagnosis, these doctors did not have the medical records of this infant. But at the time of trial, prior to trial, they would have had the medical records of this infant, and they did not have access to those medical records, correct? They did, yes. And it certainly... And did any of them change their opinions based upon those medical records? Again, I think this is sort of part of the ineffective assistance argument. It really was not focused on... Almost all of the state witnesses focused on Dr. Shupak's report, which was basically just this first emergency room scan showed intracranial bleeding, old and new. That raises concerns. And they simply went with that. And I would argue made a misdiagnosis, because we don't think... They were not aware that eight hours later the bleeding had stopped. This was a transient event. It caused no serious harm. The brain is fine. All of the cognitive testing and neurological testing of the child was fine. And I think... The other thing I want to draw here about the ineffective assistance argument is that we have a case that turns completely on radiology and these two scans. And I think that's really the point that was being made post-trial in bringing in Dr. Matt. She was a radiologist. She could actually look at the skin. Dr. Tease certainly is a very qualified witness, but this case did not involve a medical examiner or an autopsy. This case involved CT scans, and Dr. Tease admitted she can't read the CT scans. She's not trained. So I think... And again, I would defer the court to the rebuttal radiologist that was called by the state who said, yes, there's chronic bleeding on both sides of the brain. Yes, it could re-bleed on a minor ball. And I think that definitively certainly shows that this is not proof beyond a factual purpose of shaking the child. Yes, I'm glad you asked that. What the testimony was, is that... And the trial judge said his testimony and his statements, because he made it to a social worker, to a police officer, he made it again at the post-trial hearing, was that the child fell off the bed. He heard him fall. He was going to prepare his bottle. He came back, picked him up, saw that his eyes seemed to be rolling back in his head. He got nervous. He tried to revive him by gently shaking. To characterize that as a confession of violent shaking is simply a mischaracterization. And no one, the trial judge didn't make it. No witness, no child... Even Dr. Dackel, who's a child abuser, has some expertise. She didn't say that this was a confession. There was no confession that I got frustrated with the child and I shook him. No, this was to gently revive him like any father would do if the child is losing consciousness. What is it that you want from us today? Judge, we think that the defendant is entitled to a new trial, that there should be a fine of ineffective assistance, that he was entitled to a fry hearing. However, we also argue that it's not necessary in this case. I think this is the rare case that a remand is not necessary. We think this is the rare case where, in fact, this court can make a finding that the evidence was insufficient based on the record. It's a rare case where the dad, by all accounts, I understand that there was some testimony that was grumpy that day, but we have testimony in the sense that he was a loving and gentle father. He's in prison on the flimsiest of evidence. His son is now eight years old, needs his father to help him. The state's case is based on medical experts. They've got it wrong because they focused exclusively on the first scan, which showed, yes, something to be concerned about. But when you look at the full picture here, I think it is clear that the bleeding event that Dr. Schupack saw was a transient event. It resolved quickly. It left no permanent damage. And the child had a pre-existing condition that fully explains the evidence here. And each, and the state's witnesses, I'm not just talking about relying on post-trial testimony. The state's witnesses in the record conceded that, yes, there is a, there was a pre-existing condition. It was a chronic bleed. Now, we don't know that it came from the birth because it's true. There were no, there was no scan done at the, when the child was born. So we don't know that he bled. But the, but it certainly happened at some point prior to April 16. And the speculation is by all of the expert witnesses that it most likely occurred during this time. So, in my mind, yes, he should have had a prior hearing. He should have had ineffective assistance. But I think this case, the court can say that no reasonable trial or effect could have found all the elements to convict on this record. Thank you. Thank you, counsel, for your arguments. The matter will be taken under advisement. We will issue a decision in due course, and we will take a brief recess at this time.